IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| In the Matter of the Detention<br><br>of<br><br>H.T. | No. 87418-7-I<br><br>DIVISION ONE<br><br>PUBLISHED OPINION |
| --- | --- |

SMITH, J. — H.T. did not have a history of mental health issues when in September 2024, H.T. told her father that she was sleeping and eating less and that the world was not safe. Five weeks later, H.T. drove alone to the airport. At the airport, H.T. called her parents at 2:00 a.m., stating that the world was not safe and she wanted her family to escape together. H.T.'s parents brought her home, where H.T. eventually asked her parents to take her to the hospital. Fairfax Hospital petitioned for 14 days of involuntary treatment and the court found that H.T. was gravely disabled. H.T. appeals. Because a prior history of a mental illness episode or hospitalization is not required for a determination of grave disability under prong b of RCW 71.05.020(25), and substantial evidence supports the court's finding that H.T. was gravely disabled, we affirm.

FACTS

Background

H.T. is a 28-year-old nursing student who lived with her family her entire life. H.T. never talked about mental health issues and her family was not aware

that H.T. took any mental health medication.  Eight months before H.T.'s commitment, she moved out of the family home.

When H.T. visited her parents, her father observed that she looked good and did not notice any changes in the way she took care of herself.  In September 2024, H.T. told her father that she was sleeping and eating less.  Additionally, H.T. told her parents that the world was not safe, and that H.T. and her family were not safe.

Five weeks later, H.T. drove alone to the airport.  At the airport, H.T. called her parents at 2:00 a.m. and told them that the world forces were getting very dangerous and she wanted to escape with her family.  H.T.'s parents called the police and brought her home.  While H.T.'s parents were caring for her at their home, her father observed H.T. talking to herself but could not understand her.  The next day, H.T. asked her parents to take her to the hospital.

H.T.'s parents took her to the emergency room, where H.T. was not cooperative when a social worker met with her.  Because H.T. was unresponsive, her parents had to answer questions on H.T.'s behalf.  H.T. did not understand what was going on or why she was at the hospital.  While in triage, H.T. attempted to leave the hospital.  H.T.'s father and police found H.T. and brought her back to her room.  A designated crisis responder (DCR) then evaluated H.T. for involuntary treatment.  H.T. could not respond to questions or engage in a meaningful way, and the DCR noted that she appeared "distracted by internal stimuli."  On October 14, 2024, H.T. was admitted to Fairfax Behavioral Health

for treatment. H.T.'s working diagnosis was unspecified schizophrenia spectrum disorder. H.T.'s treatment team observed that she experienced paranoia, agitation, impaired impulse control, increased irritability, and confusion.

<u>Involuntary Commitment Hearing</u>

Fairfax petitioned for 14 days of involuntary treatment. At H.T.'s hearing, her father testified that prior to H.T.'s commitment, H.T. discussed that she had "kind of sometimes pressure [from] school or whatever, but she never talked— discussed about the mental problem." Then, H.T.'s father observed that H.T. became more erratic, and her sleep and diet changed dramatically five weeks before she was hospitalized. H.T. told her parents "my family [is] not safe. I'm not safe." When H.T. drove alone to the airport, H.T.'s father testified that she called her parents and encouraged them to escape together. Although H.T. asked her parents to take her to the hospital, while at the emergency room, H.T. attempted to flee when she exited the hospital. H.T.'s father also testified that he could not take care of H.T. at home because he was worried that she might run away, stating "it is risky to hold her at this time."

H.T. testified that she did not sleep for months, "barely [getting] one, two, three hours of sleep" and that she had "been pushed and then pushed and pushed without getting any rest [in] between." H.T. also stated, "I barely had time to take care of myself. I've been a mess." Later in her testimony, she testified, "Yeah, maybe something is wrong with me that makes me weak. It makes me

3

tired all the time, and I can't even stand to brush my teeth. I can't do these basic things because I am tired."

Brian Hayden, lead court evaluator at Fairfax, testified that he reviewed H.T.'s charts and records and concluded that H.T. had a behavioral health disorder with a working diagnosis of unspecified schizophrenia spectrum disorder. Hayden concluded that H.T. was gravely disabled because of her mental disorder. Hayden also testified that H.T. exhibited severe deterioration in routine functioning, and her impairment had a substantial adverse effect on her cognitive and volitional functions.

The court found that H.T.'s schizophrenia had a substantial effect on her behavior. Based on testimony, the court found that H.T. was experiencing paranoia, agitation, and varying levels of insomnia and decreased appetite such that she would not receive care essential to her health and safety outside a hospital setting. The court also found that H.T.'s medication helped her condition, but it would take a while for H.T. to stabilize so she can understand the need for mental health treatment, and she was still refusing some of the medications. Based on these findings, the court held that H.T. was gravely disabled and it granted the petition for 14 days of involuntary treatment.

H.T. appeals.

ANALYSIS

Under RCW 71.05.230(1), a petition for 14 days of involuntary treatment can be filed if the person's condition is "caused by a behavioral health disorder

4

and results in: (a) [a] likelihood of serious harm; or (b) the person being gravely disabled." "[T]he petitioner must show, by preponderance of the evidence, that the person has not in good faith volunteered for appropriate treatment." RCW 71.05.240(3).

> After a probable cause hearing,
>
> if the court finds by a preponderance of the evidence that a person detained for behavioral health treatment, as the result of a behavioral health disorder, presents a likelihood of serious harm, or is gravely disabled, and, after considering less restrictive alternatives to involuntary detention and treatment, finds that no such alternatives are in the best interests of such person or others, the court shall order that such person be detained for involuntary treatment.

RCW 71.05.240(4)(a).

For rulings on involuntary commitments, appellate courts are limited to "determining whether substantial evidence supports the findings and, if so, whether those findings support the conclusion of law and judgment." *In re Det. of T.C.*, 11 Wn. App. 2d 51, 56, 450 P.3d 1230 (2019). "The findings must be supported by substantial evidence in light of the 'highly probable' test." *In re Det. of LaBelle*, 107 Wn.2d 196, 209, 728 P.2d 138 (1986). " 'Substantial evidence is evidence that is in sufficient quantum to persuade a fair-minded person of the truth of the declared premise.' " *T.C.*, 11 Wn. App. 2d 51, 56, 450 P.3d 1230 (2019) (internal quotation marks omitted) (quoting *In re Matter of A.S.,* 91 Wn. App. 146, 153, 955 P.2d 836 (1998) *aff'd sub nom. In re Det. of A.S.*, 138 Wn.2d 898, 982 P.2d 1156 (1999)). The "burden is on the challenging party to

demonstrate that substantial evidence does not support a finding of fact." *T.C.*, 11 Wn. App. 2d at 56.

Gravely Disabled

*Gravely disabled* is statutorily defined as

> a condition in which a person, as a result of a behavioral health disorder: (a) Is in danger of serious physical harm resulting from a failure to provide for his or her essential human needs of health or safety; or (b) manifests severe deterioration from safe behavior evidenced by repeated and escalating loss of cognitive or volitional control over his or her actions and is not receiving such care as is essential for his or her health or safety.

RCW 71.05.020(25). The definition was "intended to broaden the scope of the involuntary commitment standards in order to reach those persons in need of treatment for their mental disorders who did not fit within the existing, restrictive statutory criteria." *LaBelle*, 107 Wn.2d at 205-06. Under Prong (b), the court must find that a person "manifests severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control[,]" and that they are "not receiving such care as is essential for his or her health or safety." RCW 71.05.020(25); *LaBelle*, 107 Wn.2d at 205. The statute requires that "the individual is *unable,* because of severe deterioration of mental functioning, to make a rational decision with respect to [their] need for treatment." *LaBelle*, 107 Wn.2d at 208. A "causal nexus" must exist between " 'severe deterioration in routine functioning' and proof that the person so affected 'is not receiving such care as is essential for [their] health or safety." *LaBelle*, 107 Wn.2d at 208 (quoting former RCW 71.05.020(1)(b) (1979) (LAWS OF 1979, ch. 215, § 5)) (current RCW 71.05.020(25)(b)). When determining whether a person

6

is gravely disabled, "the court must consider the symptoms and behavior of the respondent in light of all available evidence concerning the respondent's historical behavior." RCW 71.05.245.

a. Manifests Severe Deterioration from Safe Behavior

To support a finding of severe deterioration, the State must provide "recent proof of significant loss of cognitive or volitional control." *LaBelle*, 107 Wn.2d at 208.

The testimony of H.T., her father, and Hayden on her behavior supported that H.T. manifested severe deterioration from safe behavior. H.T.'s father testified that before H.T.'s commitment, she liked "to be with the family, working hard, studying hard." H.T.'s father stated, "She's a good student. She's a good girl." H.T.'s father observed that H.T. loved "to talk about family, about her education, about her future—things like that." H.T.'s father further testified that H.T.'s "goal was, within two years, to graduate from [nursing school]." But H.T.'s father noticed that H.T.'s behavior "changed dramatically" five weeks before her commitment. H.T. became paranoid, telling her parents, "Well, my family [is] not safe. I'm not safe." H.T. also told her father, "I'm less sleeping and less eating." When H.T.'s father asked if she slept well, she stated, "Well, I slept not much, didn't eat well." H.T.'s father also testified that H.T. drove herself to the airport because she thought that "we are not safe; the world is not safe." H.T.'s father elaborated further, "this is why she went last Sunday to [the] airport—to get out from the city so—because she was—she thought she's not safe. And she

7

encouraged us also to leave the state." After H.T.'s parents brought her home from the airport, H.T.'s father also testified that H.T. talked to herself and he could not understand her.

In addition to the testimony of H.T.'s father, H.T. testified about her deterioration from safe behavior, stating,

> [M]aybe something is wrong with me that makes me weak. It makes me tired all the time, and I can't even stand to brush my teeth. I can't do these basic things because I'm tired. But I have done them for years. All my life, 25 years, I pushed through the pain, and I've done it.

Although H.T. recognized that she did not sleep well and could not care for herself, she testified that her working diagnosis was

> not true. None of it's true. And I do not want it to follow me, please, outside of the hospital. I want it to be gone, just disappear like a paper you rip up and it's gone, because the real [H.T.] is staying. She's here. That's why she's here. She's still here. I'm staying. I'm not – there's nothing wrong with me.

In addition, Hayden testified that H.T.'s working diagnosis of unspecified schizophrenia spectrum disorder was based on the treatment team's observation of H.T.'s "paranoia, agitation, impaired impulse control, assaultive . . . behavior towards staff as well as destruction of property here at the hospital, the endorsement of continued paranoia that she is unsafe, increased irritability, and confusion." According to Hayden's expert opinion, H.T.'s observed behavior was "a behavioral health impairment" that had a substantial adverse effect on H.T.'s cognitive and volitional functions. Hayden's basis for his conclusions on H.T.'s condition included that "her father [gave] a baseline where she [was]," and "then over the last five weeks[,] . . . [H.T.] was showing this kind of increase in

behaviors that were outside of the normal for her." Hayden continued, "although she has specifically requested to go to the hospital for treatment, she is actively resistant to treatment, not wishing to take the medications that are being prescribed to try to address her complaints. And so, again, she is showing this disconnect between her thoughts and her actions." Hayden concluded that H.T. was gravely disabled and required more inpatient hospitalization.

We conclude that the testimony from H.T., her father, and Hayden support the court's finding that H.T.'s behavior had deteriorated. H.T.'s father's testimony established a baseline for H.T.'s health before her deterioration: she lived on her own with a roommate, loved to study, and loved to spend time with her family. H.T., her father, and Hayden then testified about her deterioration. H.T. slept less, sometimes as little as an hour, ate less, experienced paranoia, and refused medication. Substantial evidence supports that H.T. manifested severe deterioration from safe behavior.

b. H.T.'s Ability to Make a Rational Decision About Need for Treatment

The rational decision requirement ensures that "a causal nexus exists between proof of 'severe deterioration in routine functioning' and proof that the person so affected 'is not receiving such care as is essential for his or her health or safety.'" *LaBelle*, 107 Wn.2d at 208 (quoting former RCW 71.05.020(1)(b)).

The court correctly held that H.T. did not have the ability to make a rational decision about her need for medical treatment. Although H.T. initially asked to go to hospital, during her commitment, H.T.'s response to treatment

9

was inconsistent. While in treatment, H.T. attempted to leave and asked to be prematurely discharged. H.T. inconsistently took her medication, her treatment team documented that her medical compliance was poor and that H.T. stated, "I don't need medication." By the fourth day of treatment, H.T. agreed to take her medication. But at H.T.'s hearing, she testified that she did not "need medication" and "only take[s] natural things." H.T.'s inconsistent responses to medication do not support her ability to make rational decisions about her need for treatment.

Additionally, H.T. did not think that she had schizophrenia. When H.T. was asked what she wished to tell the court about her diagnosis, she testified, "It's not true. I want to tell you that it's not true." H.T.'s treatment team also noted that H.T.'s insights and judgment were impaired. Substantial evidence supports the court's finding that H.T. is unable to make a rational decision about her need for treatment.

c. Repeated and Escalating Loss of Control Over Her Actions

H.T. asserts that the court erred by finding repeated and escalating loss because no evidence shows that she had a history of mental illness or mental episodes. The State contends that prior episodes are not required to find in favor of commitment.

At contention is the interpretation of *repeated* loss of cognitive or volitional control over her actions. Our Supreme Court has held that the State must "provide a factual basis for concluding that an individual 'manifests severe

[mental] deterioration in routine functioning.' " *LaBelle*, 107 Wn.2d at 208 (alteration in original) (quoting former RCW 71.05.020(1)(b)). "[E]vidence must include recent proof of significant loss of cognitive or volitional control." *LaBelle*, 107 Wn.2d at 208. Under RCW 71.05.285, evidence of prior history or pattern of decompensation is given great weight.

Although a pattern or history of mental illness is strong evidence, it is not the sole way to find that an individual experienced repeated and escalating loss of cognitive or volitional control. Our court has affirmed commitments where repeated loss of control occurs within days.[1] In *A.S.*, we affirmed C.M.'s commitment when his mother observed that over the course of a few days, C.M. was not well kept and behaved strangely.[2] 91 Wn. App. at 153. Repeated and escalating loss of control is not exclusive to a history of mental illness episodes and can also be proven through behavior over the course of a couple of days.

Here, H.T. experienced several mental illness episodes with moments of lucid thought. H.T. told her father that the world was not safe, and five weeks later, H.T. told her family that they needed to escape. After the airport incident,

---

[1] Our court in *In re Det. of G.T.* also affirmed commitment where the State demonstrated that G.T. exhibited repeated and escalating loss of control during his initial stay for evaluation. No. 50572-0-II, slip op. at 6 (Wash. Ct. App. Feb. 6, 2019) (unpublished), https://www.courts.wa.gov/opinions/pdf/D2%2050572-0-II%20Unpublished%20Opinion.pdf.

[2] C.M. was previously diagnosed with bipolar disorder. *A.S.*, 91 Wn. App. at 153 n.3. The facts do not indicate that C.M. had prior episodes of mental illness. *See A.S.*, 91 Wn. App. at 152-53. C.M.'s mother observed that C.M. thought people were after him and that he was monitored through satellites and radio airwaves. *A.S.*, 91 Wn. App. at 153. C.M. also stood in the driveway for approximately two hours and climbed on the roof of his mother's house. *A.S.*, 91 Wn. App. at 153.

she asked her parents to take her to the hospital. But while in treatment, H.T. attempted to leave. On the first day of treatment, H.T.'s father had a conversation with H.T. that "seem[ed] ok[,]" with H.T. asking about her family, her car, and her wallet. However, H.T. also experienced paranoia in treatment and thought she was poisoned. And H.T. refused medication and requested to get discharged. But, three days later, H.T.'s treatment team noted that she stated, "part of me knows I need to be [in treatment], but I don't like the rules." We conclude that the events prior to and during H.T.'s commitment are sufficient evidence to support the court's finding that H.T. experienced repeated loss of cognitive and volitional control over her actions.

The trial court did not err when it found that H.T. was gravely disabled.

<u>History of Prior Commitment or Hospitalization</u>

H.T. asserts that involuntary commitment is unsupported because she does not have a history of prior commitment, hospitalization, or mental health treatment. The State contends that H.T.'s argument is unsupported by the statute and case law, and the statute does not require prior commitment.

RCW 71.05.020(1)(b)'s legislature intent was to "broaden the scope of the involuntary commitment standards in order to reach those persons in need of treatment for their mental disorders who did not fit within the existing, restrictive statutory criteria." *LaBelle*, 107 Wn.2d at 205-06. The statute's language, *decompensation*, "permits the State to treat involuntarily those discharged patients who, after a period of time in the community, drop out of therapy or stop

12

taking their prescribed medication and exhibit 'rapid deterioration in their ability to function independently.' " *LaBelle*, 107 Wn.2d at 206 (quoting Mary L. Durham & John Q. LaFond, *The Empirical Consequences and Policy Implications of Broadening the Statutory Criteria for Civil Commitment,* 3 YALE L. & POL'Y REV. 395, 410 (1985).

H.T.'s interpretation that RCW 71.05.020(1)(b) requires evidence of prior treatment or commitment is too narrow.  Although the legislative intent of RCW 71.05.020(1) addresses breaking cycles of mental illness,[3] its intent includes permitting "intervention before a mentally ill person's condition reaches crisis proportions[.]" *LaBelle*, 107 Wn.2d at 206; former RCW 71.05.010(4) (1973).  RCW 71.05.010's legislative intent does not suggest that the statute is limited to those with a history of repeated commitments or treatments.  *See* RCW 71.05.010(c) (stating the legislative intent "to provide prompt evaluation and timely and appropriate treatment of persons with serious behavioral health disorders"); *see* RCW 71.05.010(e) (stating the legislative intent "to provide continuity of care for persons with serious behavioral health disorders").  Further, our court has held that "neither the statute nor the relevant case law requires a prior hospitalization as an element for finding a person to be gravely disabled." *In re Det. of D.W.*, 6 Wn. App. 2d 751, 758-59, 431 P.3d 1035 (2018).  We agree

---

[3] *LaBelle*, 107 Wn.2d at 206 ("RCW 71.05.020(1)(b) enables the State to provide the kind of continuous care and treatment that could break the cycle and restore the individual to satisfactory functioning.").

with the State, the statute and case law does not support that prior commitment or treatment is required for involuntary commitment.

Harmful Consequences of Not Ordering Commitment

H.T. asserts that the State did not provide evidence that she would be harmed without involuntary commitment. H.T. further contends that the lack of evidence supporting harm is a constitutional concern.

An involuntary commitment "is a significant deprivation of liberty which the State cannot accomplish without due process of the law." *LaBelle*, 107 Wn.2d at 201. "[M]ental illness alone is not a constitutionally adequate basis for involuntary commitment." *LaBelle*, 107 Wn.2d at 201. Accordingly, " 'a State cannot constitutionally confine without more a nondangerous individual who is capable of surviving safely in freedom by [them]self or with the help of willing and responsible family members or friends.' " *LaBelle*, 107 Wn.2d at 201 (quoting *O'Connor v. Donaldson*, 422 U.S. 563, 576, 95 S. Ct. 2486, 45 L. Ed. 2d (1975)). Under the gravely disabled standard, "the potential for harm must be 'great enough to justify such a massive curtailment of liberty.' " *LaBelle*, 107 Wn.2d at 204 (internal quotation marks omitted) (quoting *In re Harris*, 98 Wn.2d 276, 283, 654 P.2d 109 (1982)). Additionally, under the severe deterioration prong of gravely disabled, "the danger of harm usually arises from *passive* behavior—*i.e.,* the failure or inability to provide for one's essential needs." *LaBelle*, 107 Wn.2d at 204.

The State provided evidence that without involuntary commitment, H.T. would be harmed. Before H.T.'s commitment, she was not sleeping and eating properly. H.T. testified that she was so tired that she could not do basic things like brush her teeth. H.T. also drove to the airport because she believed the world was not safe and she needed to escape. During H.T.'s treatment, she attempted to leave and asked to be discharged several times. At the conclusion of H.T.'s involuntary commitment hearing, the court found that there was evidence that people were concerned about her safety because she "appeared to be out of control." H.T.'s father also testified that he and H.T.'s mother were scared that H.T. would run away, and they could not care for her at home. Substantial evidence shows that there would be harmful consequences if H.T. was not committed.

H.T. also contends that the State did not show that treatment was essential to her health or safety, versus merely in H.T.'s best interest. Our Supreme Court has held that it is not enough to "show that care and treatment of an individual's mental illness would be preferred or beneficial or even in [their] best interests." *LaBelle*, 107 Wn.2d at 208. The State must show that care is "essential to an individual's health or safety" and present evidence that "indicate[s] the harmful consequences likely to follow if involuntary treatment is not ordered." *LaBelle*, 107 Wn.2d at 208 (emphasis omitted).

As discussed, substantial evidence showed that without involuntary commitment, H.T. would likely have experienced harmful consequences. In

addition to H.T.'s actions mentioned *supra*, while in treatment, H.T. did not take her medication consistently.  The court found, pursuant to expert testimony, that medical treatment is essential to her care.  The trial court did not err.

We affirm.

_____

WE CONCUR:

_____          _____, ACJ